**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
**CASE 24-11011**

---

**SOPHIA LEWIS, Individually and as Representative of the**
**Estate of Shamond Lewis, Deceased,**

**Plaintiff – Appellant**

**v.**

**ANNETTE GRANT, Officer**

**Defendant – Appellee**

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS,**
**DALLAS DIVISION**

---

**BRIEF OF THE PLAINTIFF-APPELLANT**

---

Collen A. Clark
Jacob L. von Plonski
CLARK │ VON PLONSKI │ ANDERSON
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
eservice@cvpalaw.com
jake@cvpalaw.com

**ATTORNEYS FOR PLAINTIFF-**
**APPELLANT**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
CASE 24-11011

---

SOPHIA LEWIS, Individually and as Representative of the
Estate of Shamond Lewis, Deceased,

Plaintiff – Appellant

v.

ANNETTE GRANT, Officer

Defendant – Appellee

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant | Attorneys of Record |
|---|---|
| Sophia Lewis | Collen A. Clark<br>Jacob L. von Plonski<br>Linda Le<br>Connor Barbe<br>CLARK ǀ VON PLONSKI ǀ ANDERSON<br>3500 Maple Avenue, Suite 1250<br>Dallas, Texas 75219<br><br>Stephen C. Pipkin |

i

|  | The Pipkin Law Firm<br>3500 Maple Avenue, Suite 1250<br>Dallas, TX 75219 |
| --- | --- |

| Defendant-Appellee | Attorney of Record |
| --- | --- |
| Annette Grant | Edwin P. Voss, Jr.<br>Brown & Hofmeister<br>740 E. Campbell Rd., Suite 800<br>Richardson, TX 75081 |

| Interested Third Parties | Attorneys of Record |
| --- | --- |
| Dallas County, Texas | John Creuzot<br>Criminal District Attorney<br>Dallas County<br>Jason G. Schuette<br>Joseph W. Spence<br>Dallas County District Attorney's Office<br>Civil Division<br>500 Elm Street, Suite 6300<br>Dallas, TX 75202 |

/s/ *Collen A. Clark*
Collen A. Clark

ii

## STATEMENT REGARDING ORAL ARGUMENT

In this civil rights case, the court granted summary judgment in favor of Defendant/Appellee Annette Grant, concluding that she was entitled to qualified immunity, and entered a judgment dismissing all claims of Plaintiff/Appellant Sophia Lewis against Grant. Counsel for Lewis respectfully submit that the Court's decisional process in evaluating the issues presented in this case would be significantly aided by oral argument, and request 20 minutes per side for argument.

# **TABLE OF CONTENTS**

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument ....................................................... iii

Table of Contents ......................................................................................iv

Table of Authorities ..................................................................................vi

Statement of Jurisdiction............................................................................1

Statement of the Issues................................................................................2

Statement of the Case.................................................................................3

Factual Background ....................................................................................3

Procedural Background..............................................................................13

Summary of the Argument.........................................................................15

Argument...................................................................................................18

Standard of Review...................................................................................18

I.      The district court erred in concluding Lewis did not sufficiently establish a violation of a constitutional right that was clearly established at the time of the violation so that Grant was entitled to qualified immunity.......................................................................19

        A.      The applicable law...............................................................20

        B.      Grant's use of excessive force violated a constitutional right that was clearly established at the time of the violation.. ..................21

                1.      The summary judgment evidence of Grant's use of excessive force. .......................................................22

2.      The facts in this case are sufficiently analogous to the facts in the *Simpson v. Hines* case and other cases to show the law on this manner of excessive force was clearly established. .................................................................25

II.    The district court erred in concluding that Grant was entitled to qualified immunity because at a minimum, the evidence raises genuine issues of material fact sufficient to preclude summary judgment.. ...................................................................................34

Conclusion ........................................................................................36

Certificate of Service ........................................................................38

Certificate of Compliance .................................................................39

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Aguirre v. City of San Antonio* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    <u>995 F.3d 395</u> (5th Cir. 2021)

*Austin v. City of Pasadena* . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .28-31, 33
    <u>74 F.3d 312</u> (5th Cir. 2023)

*Boyd v. McNamara* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 33
    <u>74 F.4th 662</u> (5th. Cir. 2023)

*Bush v. Strain* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
    <u>513 F.3d 492</u> (5th Cir. 2008)

*Darden v. City of Fort Worth* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30, 34
    <u>880 F.3d 722</u> (5th Cir. 2018)

*Deville v. Marcantel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36
    <u>567 F.3d 156</u> (5th Cir. 2009)

*Ducksworth v. Landrum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    <u>62 F.4th 209, 218</u> (5th Cir. 2023)

*Hanks v. Rogers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    <u>853 F.3d 738</u> (5th Cir. 2017)

*Hope v. Pelzer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    <u>536 U.S. 730</u>, <u>122 S. Ct. 2508</u>, <u>153 L. Ed. 2d 666</u> (2002)

*Kingsley v. Hendrickson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    <u>576 U.S. 389</u>, <u>135 S. Ct. 2466</u>, <u>192 L. Ed. 2d 416</u> (2015)

*Kinney v. Weaver* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    <u>367 F.3d 337</u> (5th Cir. 2004)

*Krah v. Crook* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
    <u>2010 U.S. Dist. Lexis 10655</u> (N.D. Cal. Feb. 8, 2010)

*Morrow v. Meachum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    917 F.3d 870 (5th Cir. 2019)

*Pearson v. Callahan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)

*Ramirez v. Martinez* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    716 F.3d 369 (5th Cir. 2013)

*Saucier v. Katz* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    533 U. S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)

*Scott v. Harris* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)

*Simpson v. Hines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 21, 25-27
    903 F.2d 400 (5th Cir. 1990)

*Thomas v. Great Atl. & Pac. Tea Co.* . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . 36
    233 F.3d 326 (5th Cir. 2000)

*Tolan v. Cotton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 24, 25, 34, 35, 36
    572 U.S. 650, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)

*Trammell v. Fruge* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    868 F.3d 332 (5th Cir. 2017)

## Constitutional Provisions, Rules and Statutes

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 16, 17, 20, 21, 25, 29, 34

Fed. R. App. P. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . 1

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .    1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .1, 15

## STATEMENT REGARDING JURISDICTION

The district court has original federal question jurisdiction over this civil rights case under 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4). Plaintiff/Appellant Sophia Lewis asserts federal claims against Defendant/Appellee Annette Grant pursuant to 42 U.S.C. § 1983. (ROA.166-184)[1]  This Court has jurisdiction of appeals from all final decisions of the district court under 28 U.S.C. § 1291.

The district court issued its Memorandum Opinion and Order on October 23, 2024. (ROA.1262-1285) The district court granted Grant's Motion for Summary Judgment Asserting Qualified Immunity. (ROA.1262-1285) The district court also entered a Judgment for Grant dismissing Lewis's case against her on October 23, 2024.[2] (ROA.1286)  Lewis timely filed her Notice of Appeal on November 13, 2024.  (ROA.1287-1289) This appeal is from the district court's Memorandum Opinion and Order and Judgment.  (ROA.1262-1285, ROA.1286)

---

[1]  In this Brief, "ROA." is a reference to specific pages of the Electronic Record on Appeal. Thus, the reference (ROA.166-184) refers to pages 166-184 of the Electronic Record on Appeal for this case, number 24-11011.

Lewis filed her Complaint against Dallas County and several County employees initially identified as John Doe defendants. (ROA.18-34) Lewis first identified Grant and the other jail detention officers by name in her Third Amended Complaint. (ROA.166-184)

[2]  After the district court issued the Memorandum Opinion and Order and Judgment dismissing Lewis's claims against Grant with prejudice, Lewis filed a Notice of Appeal regarding Grant. Her case against the other defendants remains in the district court.

1

## <u>STATEMENT OF THE ISSUES</u>

Issue 1:        The district court erred in concluding Lewis did not sufficiently establish a violation of a constitutional right that was clearly established at the time of the violation so that Grant was entitled to qualified immunity.

Issue 2:        The district court erred in concluding that Grant was entitled to qualified immunity because at a minimum, the evidence raises genuine issues of material fact sufficient to preclude summary judgment.

## STATEMENT OF THE CASE

This civil rights case arises from the death of Plaintiff/Appellant Sophia Lewis's ("Lewis") son Shamond Lewis[3] ("Shamond") while he was a pretrial detainee at the Dallas County Jail. (ROA.284-308) In her Fifth Amended Complaint, Lewis asserts that Shamond died from the use of excessive force by County detention staff, including Defendant/Appellee Officer Annette Grant ("Grant"). (ROA.302-304) Lewis asserts a civil rights claim for violation of Shamond's constitutional rights under the Fourteenth Amendment. (ROA.302-304)

### Factual Background

On September 22, 2022, Shamond Lewis ("Shamond") was a physically healthy 24-year-old male who suffered from paranoid schizophrenia. (ROA.662) He was arrested on an aggravated assault charge and booked into the Dallas County Jail without incident as a pretrial detainee at about 10:30 a.m.[4] (ROA.830) Shamond had been in the Jail before, and Jail personnel were aware of his mental illness, as reflected on the Jail Intake form; the box on the form for "History of Mental Illness/Intellectual Disability" was checked "Yes." (ROA.830, ROA.832) Shamond was placed on suicide precaution to be monitored in an intake holding

---

[3] In compliance with Rule 28(d), FED. R. APP. P., and as their names are similar, Lewis refers to her son as "Shamond" in her briefing. The district court also referred to him as "Shamond" in its Memorandum Opinion and Order.

[4] Dallas County created a Chronology of Events that included the time Shamond was booked into the Jail and the time he was transported by ambulance to Parkland Hospital approximately 15 hours later.

single cell; the intake form notes, "Transfer to Suicidal Tank/Crisis Stabilization—Psych Infirmary—Fly-By MAP **EXPEDITE**." (ROA.830, ROA.832)

Video of a jail hallway provided by Dallas County shows that everything changed for Shamond shortly after midnight. (ROA.703) At 12:41 a.m. on September 23, 2022, a sergeant and Detention Services Officers ("DSOs") brought Shamond to the book-in window, and he is seen calmly standing beside Jail officers. (ROA.703) At 12:45 a.m., the officers take Shamond into an adjacent room—one of the few places in the Jail out of view of surveillance cameras—to change him into jail clothes. (ROA.703)

According to Sergeant Christopher Loboda, the supervisor in charge, Shamond refused to get changed out. At the time, Shamond was being escorted by Loboda and DSOs Tavera and McDaniel. (ROA.833) Loboda stated in a Memorandum to his lieutenant, "As I attempt to restrain him by grasping his right arm, he pulled away from me and curled into a ball. Lewis was given several commands to give us his hands and quit resisting. I made several attempts to place him in a straight shoulder lock but Lewis kept resisting, was screaming, and put his other hand under his body. I was able to get one handcuff on this right arm but was not able to get his left arm." (ROA.833) Lobada stated that *six* additional officers arrived to assist him, Tavera and McDaniel in gaining control of Shamond:  DSOs Grant, Davis, Childress, De LaCruz, Emanuel, and DTO Roeman. "Once Lewis

4

was handcuffed, he was taken the rest of the way into the change out room where his clothes were cut off him and he was dressed out into a Dallas County Jail jumper." Loboda requested a restraint chair. (ROA.833)

Eight minutes after entering the change out room, at 12:53 a.m., jail officers wheeled out Shamond in a restraint chair for transfer to the Medical Assessment Program clinic referred to as MAP N0105. (ROA.830) In the Autopsy Report, Dr. Stephen Lenfest, the medical examiner who performed the autopsy, described Shamond's condition before and after he was taken out of the change out room:

> There is video surveillance that shows the decedent walking, talking, and apparently without complaint for a time period that spans more than one hour. The decedent is seen to walk into a changing room with law enforcement officers. There is video footage of the hallway outside of the changing room, but there is no video surveillance of the inside of the room. The available investigative information indicated that multiple law enforcement officer[s] restrained the decedent in an effort to change his clothes, and during this incident he was placed in handcuffs. The decedent was also placed in a restraint chair in the changing room. When the decedent is brought out of the changing room, he can again be seen on the video surveillance. He appears to have acute mental status changes but appears to be breathing and moving for several minutes prior to becoming unresponsive.

(ROA.837) When they arrived at the clinic, Sgt. Loboda gave Shamond a cup of water. Shamond told Sgt. Loboda that he couldn't breathe, then all of a sudden, he went unconscious. (ROA.841) (Tavera Statement at 5/14-24)[5]

Investigator Det. Williams viewed the surveillance footage and observed,

---

[5] Lewis retained a certified court reporter to transcribe Officer Tavera's, Officer Sawyer's, and Officer Grant's video interviews.

From the angle of the camera, it appears that a struggle ensues shortly after entering the change out room. The camera shows what appears to be an officer's legs on the ground and multiple officers responding to the location to assist. One officer responds with a restraint chair system.

At approximately 1255 hours, Shamond is rolled out of the change out room in the restraint chair. Shamond appears to be disoriented as his head sways from side to side while sitting in the restraint chair. Shamond is taken to the Medical area on the same floor and positioned in a corner, with another officer standing by.

At approximately 0105 hours, Shamond is unresponsive. Shamond is removed from the restraint chair and CPR is started.

(ROA.864) The video reflects that Shamond became unresponsive ten minutes after being wheeled out of the change out room.

The Medical Director of Parkland Correctional Health Services, Dr. Barry-Lewis Harris, prepared a death timeline for the Texas Commission on Jail Standards. The timeline described the events of September 23, 2022 as follows:

Mr. Lewis was brought to the MAP clinic from Central Intake. A nurse checked for a pulse in the right carotid, no pulse was felt. CPR was initiated by nursing staff, including using an AED, which advised no shock. CPR was continued by workforce members. Mr. Lewis suddenly took a large gasp of air and compressions stopped at that time. Pulse felt in right carotid. Mr. Lewis is bagged, IV placed to the left antecubital with 22g. Narcan was administered, no response from Mr. Lewis. The nursing staff maintained the airway until EMS arrived and assumed care. Mr. Lewis was transferred out to Parkland Emergency Department by EMS. Mr. Lewis was admitted to Parkland Hospital.

(ROA.857)

Six days after Shamond left the Jail in an ambulance, on September 29, 2022 Dr. Harris noted, "Mr. Lewis was declared brain dead while admitted to Parkland Hospital at 6:48 PM by Nuclear Medicine Cerebral Blood Flow Test performed earlier in the day." (ROA.857) On September 30, 2022, "Mr. Lewis was maintained on external respiratory support to allow for organ donation with the transplant team." (ROA.857)

Medical examiner Dr. Lenfest noted in the Autopsy Report that Shamond was 5 feet, 8 inches tall and weighed 178 pounds. His "back has widespread subcutaneous and soft tissue edema [swelling]." (ROA.835) Shamond had "Progression of cerebral edema with worsening of brain herniation during hospitalization."[6] (ROA.836)  Shamond had superficial blunt force injuries to his face, shoulders, upper extremities and lower extremities and hemorrhage in both wrists, tongue, upper back musculature, and focal subscapular hemorrhage. (ROA.836-837) Dr. Lenfest listed the cause of death and manner of death as "undetermined." (ROA.835-839)

---

[6] "A cerebral herniation or brain herniation is a serious medical condition that happens when brain tissues move from one part of the brain to another adjacent part of the brain. It is usually caused when another condition causes swelling or pressure inside the brain. Cerebral herniations are severe and need immediate treatment. A significant and sudden cerebral event usually causes cerebral herniation." Reviewed by Christopher Melinosky, MD on Oct. 23, 2023, *What is a Cerebral Herniation*? WebMD, Cerebral Herniations: what they are, their causes, symptoms, and treatments (webmd.com) (last visited Mar. 10, 2025).

On September 29, 2022, the day that Shamond was pronounced dead at Parkland Hospital, Dallas County asked the Tarrant County Sheriff's Office ("TCSO") Criminal Investigations Division ("CID") to investigate the incident. (ROA.861) As part of that investigation, CID investigators conducted interviews recorded on video of numerous witnesses, including the officers in the change out room with Shamond, and other DSOs present during Shamond's hours in the Jail. (ROA.864-867)  Sergeant Loboda refused to provide a statement. (ROA.866)

One of the DSOs CID investigator Detective Williams interviewed was Javier Tavera-Luna, who was present before, during and after the incident with Shamond in the change out room. Tavera witnessed Grant on top of Shamond's legs to hold him down in the change out room. Grant was standing on top of Shamond's legs. (ROA.842-844, ROA.849) (Tavera Statement at 11/10-20, 14/23-25, 20/4-7 and 68/20-23) Grant stood on top of Shamond with both of her feet. (ROA.848) (*Id.* at 67/2-5) When Grant was standing on Shamond's legs, he was screaming, "Why are you doing this to me? What are you doing to me?" (ROA.855-856) (*Id.* at 81/13-16 and 99/15-19) Tavera stated that Grant was standing on Shamond's legs, then she moved above his buttocks area but Tavera said he did not know exactly where. (ROA.849-850) (*Id.* at 68/20 - 69/05) When Shamond was handcuffed, he was laying on his chest with his hands cuffed behind his back. The officers dragged Shamond further back into the change out room.

(ROA.845-846) (*Id.* at 40/5-14 and 41/20-22)  While Shamond was on the floor, the officers pulled off Shamond's shorts and underwear and cut off his shirt. (ROA.847) (*Id*. at 42/12-25)

Tavera told the investigators he knew that standing on an inmate was unacceptable, and he was trained to not do so; their training is that officers don't step on or put their knees on inmates. (ROA.851) (Tavera Statement at 73/22 - 74/1) (*Id.* at 76/2-6) He never heard anyone tell Grant to get off of Shamond. (ROA.852) (*Id.* at 76/21-23)

The next day after this happened, Tavera learned that Shamond was brain dead, and he told Officer Susan Sawyer that Grant was on top of Shamond. (ROA.853-854) (Tavera Statement at 78/19 - 79/3) Sawyer responded that they weren't supposed to do that. (ROA.854) (*Id.* at 79/4-6) He knew and Sawyer knew that Grant's conduct was wrong. (ROA.854-855) (*Id.* at 79/16-18 and 81/2-4)

TCSO investigators interviewed Grant twice, on October 4 and October 7, 2022. (ROA.864-866) In her first interview, Grant told Sergeant Shelton that when she went in the change out room, there were three or four officers working to gain control of Shamond.  (ROA.910) (Grant First Statement at 5/13-14)  Grant stated she sat on the back of Shamond's legs so he would stop kicking everybody. Three different times, Grant stated that she sat on the back of his thighs. She had his hips. (ROA.910-912) (*Id.* at 5/15-17, 8/23-24, 9/8 and 9/10-11)  After the officers placed

the handcuffs on Shamond, she left. (ROA.913) (*Id.* at 13/8-9)  Grant thought their handling of the situation was by the book and they didn't do anything to cause death. (ROA.915-916) (*Id.* at 25/7-8 and 31/3-4)

Grant's second interview was with Detective Williams and Sergeant Shelton.  Grant said that when she went to the change-out room, Shamond had his back against the wall and was kicking. She told Tavera to get out of the way, they rolled Shamond over on his stomach, and she straddled the back of Shamond's thighs. (ROA.918-919) (Grant Second Statement at 4/21 - 5/16) While she was holding his legs, she was calling for handcuffs, barking orders. (ROA.926, ROA.928) (*Id.* at 21/10-12 and 27/11-12) Grant and McDaniel had Shamond's right arm. They handcuffed Shamond and she left, as they were in the process of changing his clothes. (ROA.920, ROA.929-930) (*Id.* at 6/1, 28/15-16 and 35/7-9) She didn't look back to see if Shamond was conscious. (ROA.929) (*Id.* at 28/5-8)

Grant stated they used minimum force; that's why he wasn't hurt. (ROA.922) (Grant Second Statement at 12/16-17) In direct contradiction of what she had told the investigators three times, three days before, this time Grant said she "squatted" on Shamond's thighs, she didn't sit on his thighs. (ROA.922) (*Id.* at 14/7-10) She was still in a squatting position when they rolled him over. (ROA.923) (*Id.* at 15/9-10) She was over his hip. (ROA.924) (*Id.* at 18/19-22) Grant stated, "I'm sitting on his hip so his legs weren't moving. I came in and sat

on his hip here because he was up against the wall." (ROA.927) (*Id.* at 22/4-11)

Grant declared, "I am telling the truth about every event that I witnessed in that

short time period." (ROA.931) (*Id.* at 37/5-7)

In his TCSO Report, Detective Williams stated:

Officer A. Grant was called in for a second interview. During this interview, Officer A. Grant became confrontational and argumentative. Officer A. Grant stated that she had hovered over Shamond in a squatting position while she held his arms. Officer A. Grant demonstrated the hovering position. This position seemed difficult for her to maintain during the short duration of her demonstration. This led me to believe that Officer A. Grant could not have held this position for the duration of the use of force. Officer A. Grant did not change her account of events.

(ROA.866)

On October 24, 2022, Detective Williams contacted the medical examiner's

office and reported the following information:

Det. Williams with TSO contacted DCME wanting to relay new findings in the case to the pathologist. He stated he had conducted interviews with approximately 30 people and it appears that one of the jailors was fully standing, with both feet, on the decd's back while they were trying to restrain him. She was upright with her hands by her side and approximately 180-190 pounds.

The medical examiner staff person who spoke with Detective Williams noted, "I

stated to keep us updated with further investigation and this info would be noted in

the case." (ROA.884)

Detective Williams interviewed Officer Sawyer on October 7, 2022.  Officer Sawyer was present when Shamond was at the booking room window and was told he must change his clothes, as she described:

> he was pretty compliant at first and then when they started to take him into the dressing room, he kind of switched. And so he, you know, was just—he just didn't want to do it. So the sergeant came out and got behind him and he sent me to get another guy from the other side release, so I went over there and got him and then they took him in to dress him out, which they kind of forcefully took him in.

(ROA.886-887) (Sawyer Statement at 5/19 - 6/1) Sawyer explained that the officers had Shamond by the arms as they took him in the room. (ROA.891) (*Id*. at 16/14-17) Sawyer elaborated:

> I went over to get Davis and Davis wasn't there. And the lady over there, Ms. Grant, said, what you need? And I said, well, we need help over here. They need help, you know, with the guy that's kind of out of control or whatever. I didn't really know exactly what was going on because I wasn't in there where he was.  Because, you know, the ladies don't go in to dress the guys out, so I stayed outside. But she came over and went in there. I don't know how she got in there, but she got in there.

(ROA.888) (Sawyer Statement at 7/12-23) There was yelling in the room, and as the officers were trying to handcuff Shamond, he said that he needed some water.

(ROA.890) (*Id*. at 12/12-19)  Sawyer heard one of the officers call for a restraint chair, so she went down to the first floor to get one and she brought it in.

(ROA.887) (*Id*. at 6/15-18)

In describing how the officers restrained Shamond, Sawyer said, "everybody was on him." (ROA.896) (Sawyer Statement at 26/19-20) Sawyer related to the investigators that Tavera told her that Grant put her knee on Shamond but they made him take that out of his report. (ROA.898-900) (*Id*. at 40/15-16, 41/10-12 and 42/2-4) Tavera was very afraid that he would lose his job. (ROA.898) (*Id*. at 40/1-5)

Sawyer told Detective Williams that Shamond "just didn't seem to be in his right mind." (ROA.889) (Sawyer Statement at 8/18-19) Sawyer had experience working in the west tower in the psych area, and she commented that "you have to be more patient and take more time to deal with those kind of people." (ROA.892) (*Id*. at 17/13-17) Sawyer told Detective Williams, "personally, I think they could have talked to him a little bit more and maybe got him to comply." (ROA.893) (*Id*. at 23/8-9) She thinks they could have taken more time instead of being so aggressive so quickly. (ROA.897) (*Id*. at 35/5-12)

**Procedural Background**

Grant filed a Motion for Summary Judgment Asserting Qualified Immunity on June 14, 2024. (ROA.620-707) Lewis filed her response to Grant's Motion (ROA.793-931), and Grant filed her reply. (ROA.940-948)

The district court granted Grant's Motion in a Memorandum Opinion and Order concluding that Grant was entitled to qualified immunity.[7] (ROA.1262-1285) The district court held that "it was not clearly established at the time of the incident that Officer Grant's alleged use of such force under the circumstances—i.e., in the context of the detention officers' attempts to gain control of Shamond after he resisted being handcuffed—violated the Fourteenth Amendment." (ROA.1277) The district court concluded there was no evidence, or even allegation, that Grant stood on or put her entire weight on [Shamond's] chest, possibly causing asphyxiation, as in a case Lewis invoked, *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990). (ROA.1280) The district court also concluded that Lewis had not cited any other case law that would have put Grant on notice that standing on, or putting her entire weight on [Shamond's] legs in an attempt to bring him under control constituted an objectively unreasonable use of force. (*Id.*) The district court held that Grant was entitled to qualified immunity as to Lewis's excessive force claim. (ROA.1281)

The district court's Final Judgment was filed and entered on October 23, 2024. (ROA.1286). Lewis timely filed her Notice of Appeal on November 13, 2024. (ROA.1287-1289)

---

[7] The district court resolved other pending motions in the Memorandum Opinion and Order as well.

## SUMMARY OF THE ARGUMENT

On September 22, 2022, Lewis's son Shamond was a physically healthy, 24-year-old young man who suffered from paranoid schizophrenia. He was booked into the Dallas County Jail that morning, and within 15 hours, as a result of the excessive force to his body by Grant and other officers in one of the few rooms in the Jail without surveillance cameras, Shamond became unresponsive, was brain dead within hours, and died six days later.

Lewis presented summary judgment evidence refuting Grant's alleged entitlement to qualified immunity on Lewis's federal claims under 42 U.S.C. § 1983. This evidence included documents from Dallas County's internal investigation of the incident, documents from Parkland Hospital, the autopsy conducted by the medical examiner, and evidence from the TCSO official investigation conducted at Dallas County's request, including video interviews by TCSO detectives with Grant and with the other officers present in the change out room during the excessive force. Grant initially admitted three times to sitting on Shamond's legs, then three days later she claimed to have only "squatted" over him but also admitted twice to sitting on his hip.

Officer Tavera repeatedly stated to investigators that Grant stood with both her feet on Shamond's legs as he was face down in the change out room, and also stated that Grant moved above Shamond's buttocks area. Shamond had injuries to

his back and shoulders; the autopsy revealed that Shamond's back had widespread subcutaneous and soft tissue edema [swelling]," blunt force injuries to his shoulders, and hemorrhage in his upper back musculature.

In contrast, Grant's summary judgment evidence consisted of the Dallas County Jail video of Shamond immediately before and after—but not during—the excessive force in the change out room, Grant's own self-serving affidavit, her four-sentence Memorandum to her superiors in which she claims the Shamond Lewis situation was "handled with minimal force," pleadings, and her objections to discovery responses. Apparently none of the witnesses or other evidence in the Dallas County or TCSO investigations supported Grant's account of her interaction with Shamond, as no such evidence is included to support her summary judgment motion. In fact, her fellow officer Tavera expressly refuted her account, and TCSO investigator Detective Williams—an outsider to the Dallas County Jail and it employees—did not find her shifting accounts of her actions credible.

The district court assumed *arguendo* "that Lewis can produce admissible evidence that Officer Grant stood with her entire body weight on Shamond while he was on the floor, on his stomach, surrounded by officers," and that "this conduct violated Shamond's Fourteenth Amendment right as a pretrial detainee to be free from the objectively unreasonable use of force," but erred in concluding that Grant was entitled to qualified immunity anyway. (ROA.1277) The district court held

that "it was not clearly established at the time of the incident that Officer Grant's alleged use of such force under the circumstances—i.e., in the context of the detention officers' attempts to gain control of Shamond after he resisted being handcuffed—violated the Fourteenth Amendment." (ROA.1277)

The district court concluded there was no evidence, or even allegation, that Grant stood on or put her entire weight on [Shamond's] chest, possibly causing asphyxiation, as in a case Lewis invoked and the district court very narrowly construed, *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990). (ROA.1280) The district court also concluded that Lewis had not cited any other case law that would have put Grant on notice that standing on, or putting her entire weight on [Shamond's] legs in an attempt to bring him under control constituted an objectively unreasonable use of force. (ROA.1280) The district court erred in holding that Lewis did not establish a violation of Shamond's clearly established right under the Fourteenth Amendment to be free from the use of excessive force against him so that Grant was entitled to qualified immunity. (ROA.1281) Finally, the district court erred in concluding that Grant was entitled to qualified immunity because at a minimum, the evidence raised genuine issues of material fact sufficient to preclude summary judgment.

## ARGUMENT

### Standard of Review

The Court reviews *de novo* the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity. *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017). In reviewing the district court's summary judgment decision, the Court must consider the evidence in the record in the light most favorable to Lewis, drawing all reasonable inferences in support of the conclusion that Lewis has raised a jury issue on her claims. *Boyd v. McNamara*, 74 F.4th 662, 665 (5th. Cir. 2023). When video evidence is available, the Court is required to "view the facts in the light depicted by the videotape." *Id.* at 665-666; *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). When that video evidence is inconclusive, the ordinary summary judgment standard applies. *Boyd* at 666, citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021). In this case, the video of the hallway before and after the incident does not show what occurred in the change out room.

Because Grant has asserted qualified immunity, Lewis must show the violation of a constitutional right and that "the 'right at issue was "clearly established" at the time of [the] alleged misconduct.'" *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). The standard for excessive force is

whether the force was objectively unreasonable in light of the facts and circumstances of each particular case. *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).

The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014), citing *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

> We have often explained that "[t]he law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" [*Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013] (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)). The touchstone of the inquiry is "fair notice." *Ducksworth v. Landrum*, 62 F.4th 209, 218 (5th Cir. 2023) (Oldham, J., concurring in part and dissenting in part) (citation omitted). *See also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ("[T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.")

*Boyd v. McNamara*, 74 F.4th at 669.

**I.    The district court erred in concluding Lewis did not sufficiently establish a violation of a constitutional right that was clearly established at the time of the violation so that Grant was entitled to qualified immunity.**

Regarding the first prong of the qualified immunity analysis, the district court assumed "that Lewis can produce admissible evidence that Officer Grant

stood with her entire body weight on Shamond while he was on the floor, on his stomach, surrounded by officers," and that "this conduct violated Shamond's Fourteenth Amendment right as a pretrial detainee to be free from the objectively unreasonable use of force." (ROA.1277) The district court concluded in error, however, that Lewis failed to satisfy the second prong of the test.

## A.    The applicable law

In evaluating the evidence for a qualified immunity determination, the requisite standard is as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U. S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

> Courts have discretion to decide the order in which to engage these two [*Saucier v. Katz*] prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal citations omitted).  In *Tolan*, the Supreme Court reversed summary judgment granting an officer qualified immunity because the lower court had applied the wrong standard. "Considered together, these facts lead to the inescapable conclusion that the court

below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id*. at 1867-68.  And, "[b]y weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."  *Id*. at 1868.

### B.    Grant's use of excessive force violated a constitutional right that was clearly established at the time of the violation.

The district court held that "it was not clearly established at the time of the incident that Officer Grant's alleged use of such force under the circumstances— i.e., in the context of the detention officers' attempts to gain control of Shamond after he resisted being handcuffed—violated the Fourteenth Amendment." (ROA.1277)  The district court concluded there was no evidence, or even allegation, that Grant stood on or put her entire weight on [Shamond's] chest, possibly causing asphyxiation, as in a case Lewis invoked, *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990). (ROA.1280)  The district court also concluded that Lewis had not cited any other case law that would have put Grant on notice that standing on, or putting her entire weight on [Shamond's] legs in an attempt to bring him under control constituted an objectively unreasonable use of force. (*Id*.)  The

district court held that Grant was entitled to qualified immunity as to Lewis's excessive force claim. (ROA.1281)

1. **The summary judgment evidence of Grant's use of excessive force.**

The evidence from Tavera is that Grant stood on Lewis with both of her feet, using her entire body weight on him when he was on the floor, prone on his stomach, surrounded and held down by as many as eight other officers. Grant was standing on top of Shamond's legs. (ROA.842-844, ROA.849) (Tavera Statement at 11/10-20, 14/23-25, 20/4-7 and 68/20-23) Grant stood on top of Shamond with both of her feet. (ROA.848) (*Id.* at 67/2-5) When Grant was standing on Shamond's legs, he was screaming, "Why are you doing this to me? What are you doing to me?" (ROA.855-856) (*Id.* at 81/13-16 and 99/15-19) Tavera stated that Grant was standing on Shamond's legs, then she moved above his buttocks area but Tavera said he did not know exactly where. (ROA.849-850) (*Id.* at 68/20 - 69/05)

In her two statements to the Tarrant County investigators, Grant gave an inconsistent account of her actions in the change out room. In her first interview, Grant told Sergeant Shelton, "*I sat on the back of his legs so he would stop kicking everybody.*" (ROA.910) (Grant First Statement at 5/16-17) "*I sat on the back of his*

*thighs*." (ROA.911) (*Id.* at 8/23-24) And again, "*I was sitting on the back of his thighs*." (ROA.912) (*Id.* at 9/10-11)

In Grant's second interview with Detective Williams and Sergeant Shelton conducted three days later, Grant denied sitting on Shamond's legs. This time she said, "*So I straddled the back of his thighs. . . . I'm on back of his thighs so that stopped him from kicking*." (ROA.919) (Grant Second Statement at 5/8 and 5/15-16) Then Grant denied sitting on or kneeling on Shamond's thighs; "*No, I was squatted. I showed you that*." (ROA.922) (*Id.* at 14/7-10) She said she was still in a squatting position when they rolled him over. (ROA.923) (*Id.* at 15/9-10) She was holding Shamond's legs and calling for the handcuffs. (ROA.926) (*Id.* at 21/10-12) She thought the hand she had on Shamond's waistband was keeping him from moving: "*Yes, I'm thinking because he didn't move and I'm sitting on his hip so his legs weren't moving. I came in and sat on his hip here because he was up against the wall.*" (ROA. 100) (*Id.* at 22/4-11)

To summarize, in her first statement provided ten days after the incident, Grant admitted three times to sitting on Shamond's legs. In her second statement provided three days later, Grant denied sitting on Shamond's legs, claiming she merely "straddled the back of his thighs" and "squatted" over his legs. This time, however, she admitted she sat on Shamond's hip, which is similar to Tavera's account that Grant stood on Shamond's legs, then moved up his body "above his

buttocks area." In her affidavit in support of her summary judgment motion signed approximately one year and nine months after the incident, Grant omitted any mention of sitting on Shamond on any part of his body, and claimed merely that "I only used my hands while I was crouching near Mr. Lewis' legs in an attempt to control Mr. Lewis' legs." (ROA.657 at ¶ 7)

Investigating Detective Williams described Grant's demeanor during her second interview as "confrontational and argumentative. Officer A. Grant stated that she had hovered over Shamond in a squatting position while she held his arms. Officer A. Grant demonstrated the hovering position. This position seemed difficult for her to maintain during the short duration of her demonstration. This led me to believe that Officer A. Grant could not have held this position for the duration of the use of force." (ROA.866) Detective Williams did not find Grant's story credible. On October 24, 2022, a month after Shamond's death, Detective Williams contacted the medical examiner's office and reported the following information:

> Det. Williams with TSO contacted DCME wanting to relay new findings in the case to the pathologist. He stated he had conducted interviews with approximately 30 people and it appears that one of the jailors was fully standing, with both feet, on the decd's back while they were trying to restrain him. She was upright with her hands by her side and approximately 180-190 pounds.

(ROA.884)

Although reasonableness in excessive force cases is viewed from the officer's perspective, that does _not_ mean the Court automatically accepts her testimony about what happened. *Tolan v. Cotton*, 572 U.S. at 657 (the court erred in accepting the officer's testimony that was contradicted by other evidence). As is always true at summary judgment, the facts must be viewed in favor of the nonmovant. *Id*; FED. R. CIV. P. 56.

> **2.    The facts in this case are sufficiently analogous to the facts in the *Simpson v. Hines* case and other cases to show the law on this manner of excessive force was clearly established.**

The district court held that "it was not clearly established at the time of the incident that Officer Grant's alleged use of such force under the circumstances— i.e., in the context of the detention officers' attempts to gain control of Shamond after he resisted being handcuffed—violated the Fourteenth Amendment." (ROA.1277) The district court construed the *Simpson* case too narrowly; the facts in *Simpson* are sufficiently analogous to the facts of this case to have put Grant on notice that her use of force was unconstitutional, but there are other cases as well.

In *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990), plaintiff Simpson was arrested and transported to the Cleveland, Texas city jail. He exhibited signs of drug use and volatile behavior, and resisted being searched. He was put in a cell. Then,

> A struggle ensued, the details of which are in dispute. Defendants contend that Simpson violently resisted their efforts to search his pockets. To overcome his resistance, [Police Captain] Hines put his arm around Simpson's neck while the other officers grabbed Simpson's arms and legs. The officers forced Simpson to the floor and attempted to handcuff him while [Police Officer] Broussard, nicknamed "Beef" due to his large size, sat on Simpson's chest. Unable to restrain Simpson in this position, they rolled him on his stomach, cuffed his hands behind his back, and cuffed his legs.

*Simpson*, 903 F.2d at 402. Simpson ultimately died as a result of asphyxia from the trauma to his neck. The Court denied qualified immunity:

> Defendants' own reports indicate that ten officers entered Simpson's cell and collectively used physical force against him. Captain Hines admittedly placed Simpson in a neckhold and exerted sufficient pressure to subdue him. Broussard admittedly sat "astraddle him;" an investigatory report by the Texas Rangers more precisely placed Broussard on Simpson's chest. . . . Defendants claim that such force was necessary; plaintiffs counter that Simpson's screams and repeated cries for mercy are evident on the tape recording. Finally, the tape recording contains statements from which the trier-of-fact might infer malice. Viewing the record in the light most favorable to plaintiffs, we find ample evidence that the defendant officers who entered Simpson's cell reasonably should have known that in subduing and searching Simpson they maliciously used force which was grossly disproportionate to the need and was calculated to injure Simpson severely.

*Simpson*, 903 F.2d at 403. In this case, whether Grant sat on Shamond as she admitted several times, or whether she stood on him as Tavera witnessed, Grant put her entire body weight on Lewis when he was in a vulnerable, prone position on the floor of the change out room, with tragic consequences.

26

There are numerous parallels between *Simpson* and this case. *Simpson* arrived at the stationhouse in an evidently volatile, drug-affected state and refused to be searched. *Simpson* at 401. Shamond arrived at the Jail as a paranoid schizophrenic and refused to have his clothes changed.

> Defendants' own reports indicate that ten officers entered Simpson's cell and collectively used physical force against him. Captain Hines admittedly placed Simpson in a neckhold and exerted sufficient pressure to subdue him. Broussard admittedly sat "astraddle him;" an investigatory report by the Texas Rangers more precisely placed Broussard on Simpson's chest. The custodial death report states that Simpson died of asphyxia as a result of trauma to the neck sustained during this struggle; the medical examiner's report also attributed death to trauma to the neck. Alternatively, according to a physician's report submitted by plaintiffs, Simpson could have died of asphyxiation resulting from the pressure exerted when Broussard sat on his chest. Defendants claim that such force was necessary; plaintiffs counter that Simpson's screams and repeated cries for mercy are evident on the tape recording.

*Simpson* at 401.

There were nine officers in the change out room surrounding Shamond and according to Sawyer, "everybody was on him." ([ROA.896](ROA.896)) Whether by standing on Shamond[8] or sitting on him, Grant had her entire body weight on Shamond. He

---

[8] "Moreover, the case law at the time of [Deputy] Crook's actions in this case, in 2007, clearly prohibited slamming the head of a diminutive 77-year-old plaintiff into a brick windowsill when plaintiff was not physically resisting or threatening, and thereafter twisting and bending plaintiff's arms and wrists nearly to the point of breaking them while plaintiff was on the ground and Crook was standing on his legs. . . . In sum, accepting plaintiff's evidence as true and drawing all inferences therefrom in his favor, there is a genuine issue of fact that Crook violated his constitutional rights, and Crook is not entitled to summary judgment either on the basis of qualified immunity or on the grounds that he did not violate plaintiff's constitutional rights."

was not a large man; the autopsy report shows his height at 5 feet, 8 inches and his weight at 178.[9] (ROA.835) Like Simpson, Shamond was screaming as Grant and the other officers were on him. (ROA.855-856) Although the autopsy report for Shamond does not use the word "asphyxia," there are numerous data points consistent with weight on Shamond's back and shoulders: Shamond had superficial blunt force injuries to his face, shoulders, upper extremities and lower extremities and hemorrhage in both wrists, tongue, upper back musculature, and focal subscapular hemorrhage. (ROA.836-837) Dr. Lenfest listed the cause of death and manner of death as "undetermined." (ROA.835-839)

Likewise, there are parallels between this case and *Austin v. City of Pasadena*, 74 F.3d 312 (5th Cir. 2023) and a case discussed in *Austin*. Shamond was a paranoid schizophrenic whose mental illness was known to the Jail, as reflected in his intake form. (ROA.830, ROA.832) In *Austin*, the decedent Shaw had an epileptic seizure in jail. During the seizure, Officer Marroquin and Officer Whitehead called emergency medical services ("EMS"). As Shaw was rolling on the floor convulsing and kicking, Officer Whitehead attempted to "pin and straddle" Shaw, and Officer Marroquin deployed a taser on Shaw, shocking him repeatedly. Officer Shaw also tased him during the seizure. These officers and

---

*Krah v. Crook*, No. C 08-0038 WHA (PR), 2010 U.S. Dist. Lexis 10655, at *11-12 (N.D. Cal. Feb. 8, 2010).

[9]  According to Detective Williams, Grant weighed as much or slightly more than Shamond. (ROA.884)

others made the EMS personnel wait outside the cell while they put Shaw in a restraint chair. Shaw stayed in the restraint chair for 17 minutes until he was placed in the ambulance, where he suffered cardiac arrest. Shaw died of cardiopulmonary arrest the next day. Shaw's family filed a civil rights suit alleging excessive force and improper/delayed medical treatment. *Austin*, 74 F.3d at 320. The district court granted the defendants' motion for summary judgment.

On appeal, this Court held that "viewing the record in the light favorable to Plaintiffs, a jury could find that a reasonable officer would have concluded that Shaw was continuing to experience a seizure or was in a postictal state, not actively resisting the officers, and that the physical restraint used here— particularly tasing Shaw multiple times—constituted excessive force in violation of his Fourteenth Amendment rights." *Austin*, 74 F.3d at 326. The Court noted that "[b]ased on this record, nothing prevented the officers from deescalating, leaving the cell, and waiting for EMS to arrive." *Id*. at 325. The Court determined that fact issues existed as to whether the jailers responded to the situations reasonably pursuant to their training. Marroquin testified that she was trained to avoid causing someone to suffer positional asphyxiation, which is "[p]lacing someone in a compromising position that can stop them from breathing" and she was trained not to place detainees face down on their chests. *Id*.

In this case, Shamond was placed face down on his chest in the change out room and Grant put her full body weight on him. As in *Austin*, fact issues exist as to whether Grant responded to the situation reasonably pursuant to her training. In *Austin*, the district court found for the defendants on the "clearly established law" issue. The district court determined that the plaintiffs had not identified on-point authority establishing that repeatedly tasing someone who is experiencing a seizure is unconstitutional. This Court reversed, concluding that "[g]enuine fact disputes exist as to whether the Defendant-Officers restrained and subdued Shaw before they continued to tase him, hold him in prone position on his chest with an officer's knee pressed to his back, and handcuff him in a restraint chair." *Austin*, 74 F.3d at 327. The Court held that the officers were not entitled to qualified immunity.   In its discussion of clearly established law, the Court observed, "In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful." *Austin*, 74 F.3d at 326, quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). Again, Officer Marroquin testified that she was trained to avoid causing someone to suffer positional asphyxiation, and not to place detainees face down on their chests. *Austin*, 74 F.3d at 325.

*Darden v. City of Fort Worth* is an excessive force case. The Court noted, "the evidence suggests that Darden would not have suffered a heart attack and died

if the officers had not tased him, forced him onto his stomach, and applied pressure to his back." *Darden*, 880 F.3d at 728. The Court concluded there were genuine disputes of material fact as to whether Darden was actively resisting arrest and whether the force the officers used was clearly excessive and clearly unreasonable, so that the officers were not entitled to qualified immunity. *Id*. at 729-733.

In this case, Tavera and Sawyer each stated that Grant's conduct was wrong. Tavera told the investigators he knew that standing on an inmate was unacceptable, and he was trained to not do so; their training is that officers don't step on or put their knees on inmates. (ROA.851-852) (Tavera Statement at 73/22 - 74/1) The next day after the incident, Tavera learned that Shamond was brain dead, and he told Officer Sawyer that Grant was on top of Shamond.  (ROA.853-854) (*Id*. at 78/19 - 79/3) Sawyer responded that they weren't supposed to do that. (ROA.854) (*Id*. at 79/4-6)  He knew and Sawyer knew that Grant's conduct was wrong. (ROA.854-855) (*Id*. at 79/16-18 and 81/2-4)

Also relevant to this case is the Court's discussion in *Austin* of a previous decision in which the Court held an officer was not entitled to qualified immunity.

> For instance, in *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), this court held that an officer who slammed an arrestee's face into a car after she was "handcuffed and subdued," was not entitled to qualified immunity. Notably, in that case the officer claimed the arrestee "continued resisting arrest while he attempted to cuff her." We determined, though, the duration of the arrestee's resistance was a disputed fact which precluded qualified immunity at the summary

judgment stage. This court has clarified that 'subdued' does not mean 'handcuffed.' **If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified."**

*Austin* at 326-27, citing *Bush v. Strain*, 513 F.3d at 496, 501, 502 (emphasis added) (internal citations omitted).[10]

In her affidavit, Grant justified her actions by tying her use of force to her view that Shamond was not subdued until he was handcuffed:

> After a minute or two of my struggling with Mr. Lewis' legs, and respond [sic] to Mr. Lewis' resistance to being handcuffed, Mr. Lewis' resistance was overcome, he was brought under control, and he was handcuffed by other detention officers. Once I saw that Mr. Lewis was handcuffed, I let go of Mr. Lewis' legs. All uses of force by me ceased[.]

(ROA.656 at ¶ 6)

According to Sergeant Loboda, there were as many as *nine* officers in the change out room with Shamond.[11] (ROA.833) In describing how the officers restrained Shamond, Sawyer said, "everybody was on him." (ROA.896) (Sawyer Statement at 26/19-20) So there were nine Jail officers in that small room with Shamond, who was known to be schizophrenic but unquestionably was unarmed, in a small confined space, deep inside a secure jail facility surrounded by detention officers with no possibility of flight or escape. According to the holding in *Bush*

---

[10] This Court considered *Bush*, in which the decedent was an arrestee not yet in custody, to be relevant to *Austin*, in which the decedent already was confined in a jail cell.

[11] Sawyer stated that she left the room at one point to get the restraint chair. (ROA.887) (Sawyer Statement at 6/15-18)

discussed in *Austin*, the use of force by Grant and the others on Shamond was not justified. That legal principle was clearly established by the time of this case; *Bush v. Strain* was issued in 2008, and the use of excessive force on Shamond occurred in September 2022.

Shamond initially was only passively resisting; Sergeant Loboda stated in a Memorandum to his lieutenant, "As I attempt to restrain him by grasping his right arm, he pulled away from me and curled into a ball. Lewis was given several commands to give us his hands and quit resisting."[12] (ROA.833) "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Boyd*, 74 F.4th at 668. This Court has noted that "we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Austin*, 74 F.3d at 326; *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) ("Given that only three seconds elapsed between Officer Fruge's initial request that Trammel place his hands behind his back and when Officers Fruge, Garza, and Neveu tackled Trammel, we find that a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to

---

[12] The Amended Custodial Death report regarding Shamond has specific questions on the form, posed as "Did the decedent .....?"

| | |
|---|---|
| Resist being handcuffed or arrested? | Yes |
| Attempt to Injure Others? | No |
| Escape or attempt to escape/flee custody? | No |

(ROA.905-906)

physical violence, and that the officers' conduct did not constitute the required 'measured and ascending' actions calibrated to Trammel's conduct.") Knowing that Shamond was mentally ill, the supervisor Sergeant Loboda made no attempt to calm him down and deescalate the situation, and Grant and the other officers followed his lead.

Moreover, the fact that Shamond was trying to avoid changing his clothes was not a free pass for Grant or the other officers to use *excessive* force on him as the Court has held: "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." "However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Darden*, 880 F.3d at 729 (citations omitted). In this case, the amount of force used on Shamond by Grant and the others was far beyond the need.

Viewing the record in the light most favorable to Lewis, a jury could find that a reasonable officer would have concluded that Grant used excessive force on Shamond by placing her entire body weight on him in violation of his clearly established Fourteenth Amendment rights, so that Grant was not entitled to qualified immunity.

**II.    The district court erred in concluding that Grant was entitled to qualified immunity because at a minimum, the evidence raises genuine issues of material fact sufficient to preclude summary judgment.**

Throughout this Brief, Lewis has discussed the summary judgment evidence she adduced in her summary judgment response, which she incorporates by reference in this section. In her previous sections above, Lewis has discussed cases in which there were genuine issues of material fact that precluded a summary judgment determination that the defendant was entitled to qualified immunity. This is another such case.

As the Supreme Court determined in *Tolan*, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. at 656. At a minimum, the evidence raises numerous genuine issues of material fact as to Grant's entitlement to qualified immunity. Grant's shifting accounts of her actions toward Shamond are contradicted by another officer present in the room with no apparent motive to lie. To the contrary, by relating his eyewitness account, Officer Tavera feared that he would lose his job in retaliation.

And regardless of the absence of the word "asphyxia" in the autopsy report, Shamond suffered injuries within minutes after Grant's actions that were ultimately fatal, which is the frequent pattern in these sudden death post-excessive force cases. The medical examiner noted that there were no surveillance cameras in the changing room and was clearly troubled by what had happened to this 24-year-

old young man, but with "the inability to perform comprehensive toxicology testing on samples from the time of the incident due to lack of specimen availability," he lacked sufficient physical/medical evidence from his examination of Lewis's body to provide a specific cause or manner of death. (ROA.837)

"[A] motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility. Nevertheless, when the circumstances are conducive to lying, well-supported suspicion of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (summary judgment for officer denied; Fifth Circuit determined that a reasonable jury could disbelieve the officer's testimony and find that he lacked probable cause for the arrest), quoting *Thomas v. Great Atl. & Pac. Tea Co*., 233 F.3d 326, 331 (5th Cir. 2000) (footnote omitted). Summary judgment is not appropriate when "questions about the credibility of key witnesses loom . . . large" and the evidence could permit the trier-of-fact to treat their testimony with "skeptical scrutiny." *Deville*, 567 F.3d at 156, *quoting Thomas*, 233 F.3d at 331.

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary

36

judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*,  572 U.S. at 659.  In this case, when the Court draws reasonable inferences from the evidence in favor of the non-movant Lewis, Grant is not entitled to summary judgment on qualified immunity.

## **CONCLUSION**

Plaintiff/Appellant Sophia Lewis has shown that the district court erred in concluding that Defendant/Appellee Annette Grant was entitled to qualified immunity and granting her Motion for Summary Judgment. Lewis respectfully requests that the Court reverse the Judgment in Grant's favor and remand the case against Grant for jury trial.

Respectfully submitted,

By: /s/ *Collen Clark*
        Collen Clark
Collen A. Clark
Jacob L. von Plonski
CLARK │ VON PLONSKI │ ANDERSON
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
eservice@cvpalaw.com
jake@cvpalaw.com

**ATTORNEYS FOR PLAINTIFF-
APPELLANT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that pursuant to <u>Fed. R. App. P. 25(d)</u>, on this 20th day of March, 2025, I filed this Brief via the Court's electronic case filing ("ECF") system, which will give notice of the filing to counsel for Appellee. Additionally, I certify that a true and correct copy of this document has been e-mailed to opposing counsel as listed below:

> Edwin P. Voss, Jr.
> Brown & Hofmeister
> 740 E. Campbell Rd., Suite 800
> Richardson, TX 75081
> evoss@bhlaw.net
>
> *Counsel for Appellee Annette Grant*

Respectfully submitted,

By: /s/ *Collen Clark*
　　　　Collen Clark
Collen A. Clark
Jacob L. von Plonski
CLARK │ VON PLONSKI │ ANDERSON
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
eservice@cvpalaw.com
jake@cvpalaw.com

**ATTORNEYS FOR PLAINTIFF-APPELLANT**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,564 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point type with Times New Roman font.

By: /s/ *Collen Clark*
      Collen Clark
Collen A. Clark
Jacob L. von Plonski
CLARK │ VON PLONSKI │ ANDERSON
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
eservice@cvpalaw.com
jake@cvpalaw.com

**ATTORNEYS FOR PLAINTIFF-APPELLANT**

Date:   March 20, 2025